UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF LOUISIANA

BIBLE WORLD CHRISTIAN CENTER

CIVIL ACTION

VERSUS

NO. 15-397-JJB-EWD

COLONY INSURANCE COMPANY

## RULING

This matter is before the Court on a Motion for Summary Judgment (Doc. 32) brought by the Defendant, Colony Insurance Company ("Colony"). The Plaintiff, Bible World Christian Center ("Bible World"), filed an Opposition (Doc. 41), and the Defendant filed a Reply Brief (Doc. 44). The Court requested supplemental briefs from the parties and it has considered those as well (Doc. 53).[1] Oral argument is unnecessary. The Court's jurisdiction exists pursuant to 28 U.S.C. § 1332. For the reasons stated herein, the Defendant's Motion for Summary Judgment is **GRANTED**.

## I. BACKGROUND

After a heavy rainstorm damaged its building in February 2014, Bible World took immediate action to repair its property in the belief that any repairs would be covered by a commercial property insurance policy ("Policy") it had with Colony. Bible World's claims arise from its belief that there are uncompensated losses stemming from the rainstorm. Colony argues that its $10,000 payment to Bible World satisfied its obligation under the Policy. Colony contends that there is no additional coverage for the losses or damages sought by Bible World.

### A. The 2014 Rain Event and Repairs

Bible World owns a commercial property in Baton Rouge, Louisiana, consisting of a sanctuary, offices, and rental space which is used as a day care facility by Jehovah Jireh Christian

---

[1] The Plaintiff did not file a supplemental brief by the December 12th deadline as requested by the Court.

1

Academy ("Academy").[2] On February 20, 2014, the interior of the building was damaged by water that leaked in from the roof after a heavy rain storm ("the Rain Event").[3]

David Griffin ("Griffin") is the Pastor and President of Bible World. Dirk Ricks ("Ricks") is the Principal of the Academy, the tenant who runs the day care facility.[4] Robert Chandler ("Chandler") is an employee of Omni Insurance Group.[5] Chandler assisted Bible World with procuring a commercial property insurance policy from Colony.[6] Griffin claims that Chandler "represented" that he was an agent of Colony.[7] However, Ricks apparently knew that Chandler worked for Omni Insurance.[8]

On the morning after the Rain Event, Bible World began the process of repairing the damaged property. Griffin and Ricks met with Chandler the morning after the storm.[9] Additionally, they both state that Chandler told them "to do whatever it took to get the school up and running" and that the cost of repairs would be covered under the Policy.[10] Chandler admits that the meeting took place.[11] He also admits that he told them to take the necessary steps to protect the property.[12] However, he denies telling Bible World that any repairs would be covered.[13]

Based on Chandler's alleged instructions, Griffin hired Guarantee Service Team of Professionals ("GSTP") to fix the Bible World property.[14] GSTP charged Bible World $79,876.81 for the water remediation work.

---

[2] Pl.'s Statement of Material Facts ¶ 1, Doc. 41-1.
[3] *Id.* at ¶ 4.
[4] *Id.* at ¶¶ 5, 17.
[5] Chandler Dep. 6:4-9, Doc. 32-8.
[6] *Id.* at 9:6-11; Commercial Insurance Policy CF4061610, Doc. 32-3 ("Policy").
[7] Griffin Affidavit 2, Doc. 41-4.
[8] Ricks Affidavit, Doc. 41-5 ("I made a call to Mr. Chandler with Omni Group Insurance.").
[9] Griffin Affidavit 3-6, Doc. 41-4; Ricks Affidavit, Doc. 41-5; Chandler Dep. 20:4-19, Doc. 32-8.
[10] Griffin Affidavit 6, Doc. 41-4; Ricks Affidavit, Doc. 41-5.
[11] Chandler Dep. 24-25, Doc. 32-8.
[12] *Id.*
[13] Chandler Dep. 25, 47-48, Doc. 32-8.
[14] Griffin Affidavit, 4, Doc. 41-4.

Based on Colony's investigation of the damages, it issued a $10,000 payment to Bible World for sewer and water backup coverage contained in a part of the Policy called the Gold-Pak Endorsement.[15] Colony continues to maintain that this $10,000 payment satisfied its obligation under the Policy.

### B.    The State Court Action[16]

This matter was initiated by GSTP against Bible World and its tenant, the Academy, in the 19th Judicial District Court for the Parish of East Baton Rouge. GSTP was seeking to recover $79,876.81 for unpaid water remediation work. Eventually, a consent judgment was entered in favor of GSTP against Bible World. Prior to being removed to this Court, Bible World filed a third party demand against Colony alleging that coverage existed under the Policy issued by Colony to Bible World.

### C.    Cause of the Damage

Bible World designated Leon Hickman and Bertell James as its experts. Colony designated Kevin Vanderbrook as one of its experts. Each of the experts examined the roof drainage system which contains twenty-one downspouts that are located inside the wall cavity of the building. These downspouts all lead to subsurface drainage located in the rear of the building.

All of the experts appear to agree on two major issues. First, they all noted that there were no physical holes or other damage to the roof from the Rain Event.[17] Second, they all agreed that the damage to the interior of the property was caused by water that overflowed at the gutter and entered the interior of the building through openings in the ceiling that were part of the original

---

[15] *Def's. Supp. Br.* 2, Doc. 53.

[16] This information is taken from *Def.'s Supp. Mem.* 2-3, Doc. 32-1.

[17] James Affidavit 2, Doc. 41-10; Vanderbrook Report 3, Doc. 32-7 ("There was no indication of uplift, wind damage, openings, or other penetrations in this roof."). While Hickman did not directly state that there was no damage to the roof, he stated that he "could not determine damages to the roofing insulations without removal of area roofing." Hickman Affidavit 2, Doc. 41-9.

3

design of the building.[18] The design of the gutter system "created openings where the corrugated metal roof decking intersected the gutter drain."[19]

While the three experts seem to agree that the gutters overflowed causing extensive damage to the interior, they seem to disagree as to *why* the gutters overflowed.

Colony's expert, Vanderbrook, believed that the gutter overflowed because of clogged downspouts caused by improper maintenance. He reached this conclusion after examining the gutter system. Vanderbrook found that the gutter overflowed because fourteen of the twenty-one downspouts were blocked.[20] They were plugged by both debris and roofing material. He determined that when the Rain Event occurred, the downspouts could not handle all the water which led to the overflow.[21] He also noted that "the remaining seven drains appeared to be generally free of obstructions at the top level," but he was unable to "determine whether these drains operated properly all the way to the subsurface storm sewer in the rear yard without obstructions down the pipe."[22]

Hickman and James appear to disagree with Vanderbrook. They admit that the gutter overflowed but deny that it was solely attributable to the blocked downspouts. Hickman disagreed with Vanderbrook but did not offer an alternative explanation as to how the gutters overflowed. Hickman stated that "it would be necessary to perform a thorough examination…[in] making a determination that the fourteen (14) [downspouts were] allegedly blocked or partially blocked and

---

[18] Hickman Affidavit 2, Doc. 41-9 ([T]he water over flowed and entered the roof structure."); James Affidavit 2, Doc. 41-10 ("[B]ecause of the constant rainfall on February 20, 2014, with no place for the rain to go, the gutters were simply overwhelmed and filled with water, and were simply not able to absorb the rainfall fast enough to overcome the amount of rain that poured onto the building, which he is simply unable to explain, which resulted in the sustained water, combined with no place for the water to go other than crevasses and openings down the walls."); Vanderbrook Report 6, Doc. 32-7.

[19] *Id.* at 4.

[20] *Id.* at 3.

[21] *Id.*

[22] *Id.*

whether or not the blocked fourteen (14) roof drains alone would have cause[d] water to back up in the building without further explanation."[23] Hickman did not perform an examination of the downspouts.

James, however, seemed to offer an alternative explanation as to how the gutters overflowed. He stated that he thought there may have been leaves plugging the drains but that these plugs would not have been significant enough to cause the overflow.[24] He believed that "a number of factors combined may have resulted in the backup of water [including] extensive rain, street flooding, sewage backup, and other related problems."[25] James did not elaborate further on how these other related problems, rather than the fourteen clogged drains, would have led to the gutter overflow.

## II.   SUMMARY JUDGMENT STANDARD

Summary judgment should be granted if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.[26] An issue is material if its resolution could affect the outcome of the action.[27] When assessing whether a dispute as to any material fact exists, a court must consider all of the evidence in the record but refrain from making credibility determinations or weighing the evidence.[28] However, a court does not have a duty to search the record for material fact issues. Rather, the party opposing the summary judgment is required to identify specific evidence in the record and to articulate precisely how this evidence supports his claim.[29]

---

[23] Hickman Affidavit 3, Doc. 41-9.
[24] James Affidavit 2, Doc. 41-10.
[25] *Id.*
[26] Fed. R. Civ. P. 56(a).
[27] *DIRECTV Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (citation omitted).
[28] *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co*., 530 F.3d 395, 398-99 (5th Cir. 2008) (citations omitted).
[29] *Ragas v. Tenn. Gas Pipeline Co.*, 136 F.3d 455, 458 (5th Cir. 1998).

5

A dispute is considered genuine if a reasonable jury could return a verdict for the nonmoving party.[30] A party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case.[31] If the moving party satisfies its burden, the nonmoving party must show that summary judgment is inappropriate by setting forth specific facts showing the existence of a genuine issue concerning every essential component of its case.[32]  A court must resolve all reasonable factual inferences in favor of the nonmoving party.[33] However, the nonmoving party's burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence.[34]

## III.   LAW AND ANALYSIS

In determining whether to grant summary judgment and dismiss the claims against Colony, this Court must resolve two issues. First, it must address whether Chandler was an agent of Colony who had the power to bind Colony when it came to coverage decisions. Second, it must address whether the Policy provides any additional coverage, beyond the $10,000 payment Colony made to Bible World, for the damages alleged in this case. This Court finds that Chandler was not an agent of Colony and therefore had no power to bind Colony to pay for the repairs. Further, there is no additional coverage, beyond the $10,000 that has already been paid to Bible World, for the alleged damage that took place here. Louisiana law governs both these issues.

---

[30] *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).
[31] *Guerin v. Pointe Coupee Parish Nursing Home,* 246 F.Supp.2d 488, 494 (M.D. La. 2003) (internal quotation marks and citations omitted).
[32] *Rivera v. Houston Independent School Dist.,* 349 F.3d 244, 247 (5th Cir. 2003) (internal quotation marks and citations omitted).
[33] *Galindo v. Precision American Corp*., 754 F.2d 1212, 1216 (5th Cir. 1985).
[34] *Willis v. Roche Biomedical Laboratories, Inc.,* 61 F.3d 313, 315 (5th Cir. 1995) (internal quotations and citations omitted).

6

### A.    Chandler is Not an Agent of Colony.

Bible World argues that Chandler was an agent of Colony and therefore, when he told Bible World to repair the property damage, he bound Colony to pay for those repairs. Colony argues that Chandler is not an agent of Colony and so any alleged statements he made about coverage cannot be imputed to Colony.

Under Louisiana law, an insurer can waive a no coverage defense or, alternatively, it can be equitably estopped from asserting the no coverage defense by its conduct in a given case.[35] In other words, coverage can be extended or enlarged by an agent's representations. The acts of one procuring insurance as agent of the insurer are imputable to the insurer.[36] Therefore, if Chandler was an agent of Colony, Chandler's alleged statement that the repairs would be covered could modify Colony's liability under the Policy.

Insurance agents are individuals employed by the insurance company to solicit risks and effect insurance.[37] "Insurance brokers, on the other hand, solicit insurance from the public under no employment from any special company, placing the insurance with any company selected by the insured."[38] While Louisiana statutes define terms like agent, broker, and solicitor for the purposes of determining what sort of license or examination is required, "these regulatory statutes do not prevent the courts from finding that an agency relationship exists in fact, outside the scope of the statutes."[39]

---

[35] *Tate v. Charles Aguillard Ins. & Real Est.*, 508 So.2d 1371, 1375 (La. 1987) ("[W]aiver may apply to any provision of an insurance contract under which the insurer knowingly and voluntarily elects to relinquish his right, power or privilege to avoid liability, even though the effect may bring within coverage risks originally excluded or not covered."); *Cugini, Ltd. v. Argonaut Great Cent. Ins. Co.*, 04-795, p. 15 (La. App. 5th Cir. 11/30/04), 889 So.2d 1104, 1114 (finding that coverage existed under a policy under theories of waiver, equitable estoppel, or detrimental reliance, where insurer knew plaintiff was proceeding with repairs but did not indicate to plaintiff that repairs would not be covered).

[36] *Tassin v. Golden Rule Ins. Co.*, 94-0362, p. 7 (La. App. 1st Cir. 12/22/94), 649 So.2d 1050, 1054.

[37] *Id.*

[38] *Id.*

[39] *Tiner v. Aetna Life Ins. Co.*, 291 So.2d 774, 777 (La. 1974) (internal quotation marks and citation omitted).

Generally, the broker is considered to be the agent of the insured.[40] However, in certain circumstances, a broker may be found to be the agent of the insurer with the capability to bind the insurer.[41] Whether a broker in any particular transaction acts as the agent of the insurer is a question of fact dependent upon the particular circumstances of the case.[42] Under Louisiana law, a court can look to four factors to determine if an insurance broker is an agent of the insurer in a specific case—(1) whether there is a direct relationship between the insurer and the broker; (2) whether the broker is an agent in fact; (3) whether there was an ongoing or prior relationship between the broker and the insurer; and (4) whether the insurer exercises significant control over the broker.[43]

Additionally, "a principal/agent relationship is determined from the facts surrounding the two parties involved. [A court does] not consider the subjective belief of a third party to determine whether or not an agency relationship exists between two different parties."[44] Accordingly, Bible World's belief that Chandler was a representative of Colony has no bearing on whether Chandler was actually an agent of Colony. This Court must look to the four factors to determine if an agency relationship existed.

After analyzing the four factors, there can be no reasonable inference that an agency relationship existed between Chandler and Colony. Chandler was a broker employed by Omni Insurance. His role in that company was to act as a liaison between insurance companies, like Colony, and potential clients.

---

[40] *Karam v. St. Paul Fire & Marine Ins. Co.*, 265 So.2d 821, 824 (La. App. 3d Cir. 1972), *affirmed*, 281 So.2d 728 (La. 1973).
[41] *Tassin*, 649 So.2d at 1054.
[42] *Tiner*, 291 So.2d at 778; *Tassin*, 649 So.2d at 1054; *Smason v. Celtic Life Ins. Co.*, 615 So.2d 1079, 1084 (La. App 4th Cir. 1993).
[43] *Smason*, 615 So.2d at 1084-85; *North Am. Capacity Ins. Co. v. Brister's Thunder Karts, Inc.*, Civil Action No. 97-330, 1998 WL 259966, at *4 (E.D. La. May 20, 1998) (applying Louisiana law).
[44] *Smason*, 615 So.2d at 1085.

8

The first factor noted by the *Smason* court was whether a direct relationship existed between the broker and the insurer. The absence of that direct relationship was demonstrated by the fact that the application forms were not furnished by the insurance company to the broker.[45] Additionally, the broker in *Smason* communicated with the insurance company only through another broker.[46] Like the broker in *Smason* who used application forms not provided by the insurance company, Chandler used standard industry application forms to apply for insurance for Bible World rather than forms issued by Colony.[47] Additionally, Chandler generally communicated with Colony only indirectly through a broker called Interstate.[48] Accordingly, there was no direct relationship between Colony and Chandler.

The second factor, whether the broker was an agent in fact, requires a determination of whether an agent represents only one insurer or whether he considers other companies and presents applications to those companies. Chandler was not an agent in fact of Colony because he worked with approximately fifty different companies.[49]

The third factor examines whether there was an ongoing or prior relationship between the broker and the insurer. Although Chandler worked for approximately fifty companies, he had a 15-20 year relationship with Colony.[50] This factor weighs in favor of finding an agency relationship.

---

[45] *Id.* at 1084.
[46] *Id.*
[47] Chandler Dep. 9:12-19, Doc. 32-8.
[48] *Id.* at 21:19-24; 41:9-13.
[49] *Id.* at 43.
[50] *Id.* at 7:15-23.

The fourth factor, control, is the most important factor.[51] If a certain entity controls a broker, that broker is most likely an agent of the entity. The Court finds that Colony had no power to control or order Chandler to do anything.

Viewing the facts in the light most favorable to Bible World, as this Court is required to do, and taking it as true that Chandler directed Bible World to repair the property, Colony is not liable to Bible World because no reasonable factfinder could find that Chandler was an agent of Colony.[52]

### B.     Bible World Has Satisfied Its Obligation Under the Policy.

Having determined that Chandler was not an agent of Colony and was unable to change the coverage that the Policy provided, this Court must next determine whether the damages to the Bible World property are covered under the Policy.

Under Louisiana law, the interpretation of an insurance contract is typically a question of law which can be properly resolved in the framework of a motion for summary judgment.[53] An insurance policy is an agreement between the parties and is interpreted using ordinary contract principles.[54] "Therefore, when the words of the policy are clear, unambiguously express the intent of the parties, and lead to no absurd consequences, the contract must be enforced as written."[55] Words and phrases used in the policy are to be construed using their ordinary and generally prevailing meaning.[56] "An insurance policy should not be interpreted in a strained manner so as to

---

[51] *Smason*, 615 So.2d at 1085.

[52] In finding that Chandler was not an agent with the ability to bind Colony, the Court also finds the holding in *Neustadter v. Bridges* persuasive: "Fulton & Johnson acted as insurance 'brokers' or agents for the insured, the Church, and not as agents for the insurance company. Under these circumstances, any representations made by the brokers to the Church concerning coverage were not binding on the insurer… Likewise, any fault of the brokers in handling the matter for the Church is not imputable to the insurer." 406 So.2d 738, 741 (La. App. 4th Cir. 1981) (citations omitted).

[53] *Dunn v. Potomac Ins. Co. of Ill.*, 94-2202 (La. App. 1st Cir. 6/23/95), 657 So.2d 660, 664.

[54] *Reynolds v. Select Props. Ltd.*, 93-1480 (La. 4/11/94), 634 So.2d 1180, 1183.

[55] *St. Joseph's Condominium Ass'n, Inc. v. Pacific Ins. Co.*, Civil Action No. 07-3959, 2008 WL 4717463, at *3 (E.D. La. Oct. 27, 2008) (applying Louisiana law).

[56] *Reynolds*, 634 So.2d at 1183 (citations omitted).

enlarge or restrict its provisions beyond what is reasonably contemplated by its terms or so as to achieve an absurd conclusion."[57] "If, after applying the other rules of construction, an ambiguity remains, the ambiguous provision is to be construed against the drafter and in favor of the insured."[58]

Although policies should be construed to effect, and not to deny coverage, insurance companies have the right to limit coverage in any manner they desire, so long as the limitations do not conflict with public policy.[59] In other words, although exclusions are to be strictly construed in favor of coverage, this rule of strict construction does not authorize a "perversion of language or the exercise of inventive powers" to find coverage where none exists.[60]

In general, the burden is on the insured to demonstrate that a loss is encompassed by the general provisions of the policy, while the burden is on the insurer to show that coverage is negated by a specific exclusion or limitation.[61]

### 1. Relevant Policy Provisions

The insuring agreement of the policy provides:

\*\*\*

**BUILDING AND PERSONAL PROPERTY COVERAGE FORM**
\*\*\*
**A. Coverage**
**We will pay for direct physical loss of or damage to Covered Property at the premises described in the Declarations caused by or resulting from any Covered Cause of Loss.[62]**
\*\*\*
**3. Covered Causes of Loss**
**See applicable Causes of Loss Form as Shown in the Declarations.[63]**
\*\*\*

---

[57] *Id.*
[58] *Id.*
[59] *Id.*
[60] *Id.* (internal quotation marks and citations omitted).
[61] *Doerr v. Mobil Corp.,* 00-0947 (La. 12/19/00), 774 So.2d 119, 124.
[62] Policy, 42, Doc. 32-3.
[63] *Id.* at 44.

The Declaration page of the Policy designates a "Special" Causes of Loss Form[64] and, thus, the applicable policy language reads as follows:

\*\*\*

**A. Covered Causes of Loss**
**When Special is shown in the Declarations, Covered Cause of Loss means Risks of Direct Physical Loss unless the loss is:**
**1. Excluded in Section B., Exclusions; or**
**2. Limited in Section C., Limitations; that follow.[65]**

\*\*\*

For purposes of interpreting the Policy, this Court finds that three sections of the Policy are relevant—(1) a section that excludes coverage for damages to an interior of a building caused by rain unless the rain enters through an opening created by damage to the building ("Rain Limitation"); (2) a section that excludes coverage for damages from water that overflows from a sewer or drain ("Overflow Exclusion"); and (3) a section that brings back coverage for damages from water that overflows from a drain for damages totaling up to $10,000 ("Gold-Pak Endorsement"). These sections are excerpted below:

\*\*\*

**C. Limitations**
**The following limitations apply to all policy forms and endorsements, unless otherwise stated.**
**1. We will not pay for loss of or damage to property, as described and limited in this section…**
**c. The interior of any building or structure, or to personal property in the building or structure, caused by or resulting from rain, snow, sleet, ice, sand, or dust, whether driven by wind or not, unless:**
**(1) The building or structure first sustains damage by a Covered Cause of Loss to its roof or walls through which the rain, snow, sleet, ice, sand or dust enters.[66]**

\*\*\*

**WATER EXCLUSION ENDORSEMENT**
**A. The exclusion in Paragraph B. replaces the Water Exclusion in this Coverage Part or Policy.**
**B. Water…**
**3. Water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment;[67]**

---

[64] *Id.* at 8.
[65] *Id.* at 59.
[66] *Id.* at 64.
[67] *Id.* at 69.

\*\*\*

**GOLD PAK ENDORSEMENT**
**This endorsement modifies insurance provided under the following:**
**BUILDING AND PERSONAL PROPERTY COVERAGE FORM**
**Section A. Coverage, Item 4. Additional Coverages is amended to include the following**
**coverage for the Limits of Insurance specified in the SCHEDULE below…**
\*\*\*
**20) Sewer and Water Backup……$10,000[68]**
\*\*\*

**20. SEWER AND WATER BACK-UP**
**We will pay for loss or damage up to the limit specified in the SCHEDULE above arising**
**out of a Covered Cause of Loss to covered Property at the premises described on the**
**Declarations. Under this endorsement, Covered Cause of Loss means loss or damage**
**resulting from or cause [sic] by water that backs up from sewer or drains.[69]**
\*\*\*

**2.   Analysis**

Colony makes two arguments as to why there is no coverage. First, it argues that in order

for rain damage to be covered under the Policy, the rainwater must have entered through an exterior

opening created by damage to the property. Colony argues that there is no coverage under this

theory because the water did not enter through exterior damage to the building. Second, Colony

argues that the Policy does not pay for damages caused by a defective or poorly maintained roof

drainage system.[70] In opposing the summary judgment motion, Bible World states, without further

discussion, that it disagrees with Colony's interpretation. Bible World argues that there is coverage

by pointing the Court to six provisions of the Policy without explaining how they apply to the

alleged damages that occurred here.[71]

The Court finds that, based on the experts' reports, it is undisputed that the damage to the

interior of the building would not have happened but for three conditions: (1) a heavy rainstorm;

---

[68] *Id.* at 28.
[69] *Id.* at 37.
[70] The Court need not address Colony's defect exclusion argument because, even construing the Policy in favor of coverage, the Court finds that the most amount of money Bible World can recover under the Policy is $10,000 based on the Gold-Pak Endorsement.
[71] *Pl.'s Opp.* 6, Doc. 41.

(2) some clogged downspouts; and (3) a gutter design that allowed water from the full gutter to enter the interior (design of the drain in this area created openings where the corrugated metal roof decking intersected the gutter drain).

In other words, the Court finds that there were two main causes of the damages that occurred here – the rain and the failure of the downspouts to drain properly. Assuming that the rain was the cause of the loss, the Court finds that Colony does not owe Bible World anything. Alternatively, assuming that the cause of the damages was the failure to drain, the Court finds that, at most, Colony owes Bible World $10,000. However, because Colony has already issued that amount to Colony, it owes Bible World nothing more under the Policy and granting summary judgment in Colony's favor is appropriate.

<u>The Rain Limitation</u>

The Court agrees with Colony's interpretation of the Rain Limitation and its applicability to the instant case. Pursuant to the Rain Limitation, Colony argues that coverage does not exist for damages to the interior of any building caused by rain unless the building first sustains damage to its roof or walls through which the rain enters. It is undisputed that the Bible World property did not sustain damage resulting in physical openings to its roof or walls through which the rain entered. Both Colony's expert and Bible World's expert found that the roof was intact and that the water seeped in through pre-existing openings in the ceiling.[72] Assuming that the rain was the cause of the damages to the interior of Bible World's building, Bible World does not have any coverage.

---

[72] James Affidavit 2, Doc. 41-10 ("[T]here were no defects or problems with roof itself…[there was] no place for the water to go other than crevasses and openings down the walls."); Vanderbrook Report 3-4, Doc. 32-7 ("There was no indication of uplift, wind damage, openings, or other penetrations in this roof…The source of water intrusion was overflow in the roof gutter drain, specifically on the edge furthest from the rear wall. The design of the drain in this area created openings where the corrugated metal roof decking intersected the gutter drain.").

The Overflow Exclusion and Gold-Pak Endorsement

However, the Court is aware that under Louisiana law, "policies should be construed to effect, and not to deny, coverage."[73] In arguing that coverage exists for the damages that occurred here, Bible World places heavy emphasis on the Federal First Circuit case *Fidelity Co-op. Bank v. Nova Casualty Co*.[74] Bible World argues that in that case "the First Circuit held that a so-called 'chain' or 'train' of events, i.e., rain, the rain backed up at the drain, and the backed up water eventually pooled high enough to flow over the tops of the skylights, such as the one experienced by Bible World, caused the water damages it sustained, concluding that the pooled water on the roof was surface water, not rain, and therefore, coverage was not excluded, and such is the case in this matter."[75]

The Court understands the Plaintiff to be citing this case to argue that the true cause of the damage here was not the rain, but rather, the blocked drains. Notwithstanding the fact that the *Fidelity* case is not binding on this Court, the Plaintiff fails to see another key distinction between the *Fidelity* case and the instant case. In *Fidelity*, damage caused by blocked roof drains was covered under the Policy.[76] Here, damages caused by blocked roof drains are covered under the

---

[73] *Reynolds*, 634 So.2d 1180.
[74] 726 F.3d 31, 38 (1st Cir. 2013).
[75] *Pl.'s Opp.* 9, Doc. 41.
[76] 726 F.3d at 38 ("Thus, we find that, when the blocked or inadequate drain was overwhelmed by the severe rainstorm, it set in motion a 'train of events' lacking the intervention of any forces or the activation of a new source to cause the interior water damage. **The failure of the drain must properly be deemed the 'efficient proximate cause' of the damage, not the rain. The blocked or inadequate roof drain was a covered loss under the Policy**...it was error for the district court to conclude that the interior damage was 'caused by rain' and was excluded from coverage under the rain limitation provision.") (emphasis added).

Policy but only up to a limit of $10,000.[77] It is undisputed that Colony has already paid Bible World $10,000, and so the Court finds that Colony has satisfied its obligation to Bible World.[78]

## IV.   CONCLUSION

For the reasons stated above, the Defendant's Motion for Summary Judgment (Doc. 32) is **GRANTED**.

Signed in Baton Rouge, Louisiana, on December 20, 2016.

_____

**JUDGE JAMES J. BRADY**
**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF LOUISIANA**

---

[77] Initially, damage caused by "water that backs up or overflows or is otherwise discharged from a sewer, drain, sump, sump pump or related equipment" is not covered. Policy 69, Doc 32-3. However, the Gold-Pak Endorsement brings back coverage for up to $10,000 worth of damage caused by "water that backs up from sewers or drains." *Id.* at 37.

[78] *Def's. Supp. Br.* 3, Doc. 53 ("[T]he $10,000.00 payment to Bible World was tendered based on the $10,000.00 coverage limit for Sewer and Water Back-up coverage in the Gold-Pak Endorsement of the Colony Policy…But for the Gold-Pak Endorsement, there would not have been any coverage for Bible World's claimed loss based on Colony's investigation.").

16